02-11-180-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00180-CV

 

 


 
 
 In the Interest of S.S.A.,
 a Child
 
 
  
 
 
  
 
 


 

 

----------

FROM THE 431st
District Court OF Denton COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

Appellant
Frank[2] appeals the trial court’s
order terminating the parent-child relationship between S.S.A. and himself.  In
six issues, Frank challenges the legal and factual sufficiency of the evidence supporting
each of the grounds the trial court found for termination under Texas Family
Code section 161.001(1).[3]  He also challenges the
legal and factually sufficiency of the evidence supporting the trial court’s
finding that termination of his parental rights regarding S.S.A. was in her
best interest.[4]  We will affirm.

II.  Background

This
case originated in an alleged sexual assault of S.S.A.  The alleged assailant
was the roommate of S.S.A.’s biological mother, Kim, with whom S.S.A. lived in
Denton, Texas.  The ensuing investigation involved the Texas Department of
Family and Protective Services (CPS or Department) seeking the termination of
Frank’s and Kim’s parental rights to S.S.A.

When
the termination proceedings began in November of 2009, S.S.A. was four years
old, and CPS had not yet located Frank.  Due to travel issues, Kim, who had now
moved to East Texas with a boyfriend, was also not at the initial hearing.[5] 
She was, however, represented by counsel.  At that time, CPS asked that S.S.A.
be temporarily placed with her maternal aunt and that the trial court order an
expedited home study of S.S.A.’s maternal grandfather, who lives in Florida, so
that she might be placed with him.  S.S.A. had lived with him for several
months when she was a baby.  The trial court granted CPS’s requests.

The
trial court held a status hearing in June 2010.[6]  At the hearing, CPS
revealed that it had finally contacted Frank—located in an Iowa prison.  After receiving
notification of CPS’s intention to seek termination of his paternal rights to S.S.A.,
Frank answered by sending a letter to CPS seeking paternity testing and the
appointment of counsel.  The trial court ordered paternity testing.

At
the time of an August 5, 2009 permanency hearing, Kim had also been
incarcerated in Iowa and S.S.A. had been placed with “her grandmother.”  CPS
asked for S.S.A. to remain there, pending the scheduled paternity testing.  The
trial court held another permanency hearing on November 22, 2010.  At that
hearing, the trial court approved S.S.A.’s placement with her maternal
grandfather.

On
March 17, 2011, the trial court held another permanency hearing.  Frank,
now represented by counsel, was still incarcerated in Iowa.  Although Kim had
been released from incarceration in the fall of 2010, she had not returned to
Texas and was not at the hearing.  A CPS investigator testified that tests
confirmed Frank as S.S.A.’s biological father.  Frank’s attorney explained that
although he had initially spoken with Frank on the phone, Frank had since been
moved to a different Iowa penal facility, and that he had since had difficulty
contacting Frank.  The trial court ordered that S.S.A. remain with her maternal
grandfather.

The
trial court held the termination trial on May 2, 2011.  Kim’s attorney
testified that despite some contact with Kim earlier in the proceedings, and
Kim’s request to attend the termination trial, Kim had not responded to recent
notifications of the trial date and Kim had also not responded to repeated
attempts to contact her through her attorney.  Frank’s court-appointed attorney
stated that he had recently spoken with Frank and that he wanted to attend the
trial, but that due to his incarceration in Iowa, Frank was unable to attend
the hearing.[7]  Due to the absence of
both parents, Kim’s attorney moved to withdraw Kim’s earlier request for a jury
trial, and all parties agreed to proceed with a trial before the bench instead.

Nerrissa
Bryant, a CPS investigator, testified.  According to Bryant, CPS received a
referral regarding S.S.A., concerning an allegation of a possible sexual
assault of S.S.A. by Kim’s then roommate.  Bryant gathered information about
the alleged assault and also investigated S.S.A.’s familial setting.  During
her investigation, Bryant learned of Frank.  By Bryant’s account, Kim informed
her that Frank was in Iowa, but that she was unsure of his exact location.  Kim
also relayed to Bryant that Frank was aware that he was S.S.A.’s father.  Kim
conveyed to Bryant that Frank was unhappy about her having become pregnant and
that they later broke off their relationship.  Bryant said that Kim told her
that Frank had never paid any child support and had never had any contact with
S.S.A.  Bryant also said that, according to Kim, Frank did once try to set up a
visit with S.S.A. when she was roughly one year old, but that the visit never
happened.  Bryant also testified that S.S.A. shared the last name of another of
Kim’s friends, who was neither Frank nor the person she lived with when
allegations of sexual abused were raised.

Because
Kim had previously tested positive for marijuana on an earlier CPS referral
regarding S.S.A. and because of her behavior during an interview, Bryant called
for drug testing.  Kim tested positive for methamphetamines.  Furthermore,
Bryant said that CPS gathered evidence that Kim had sexually assaulted S.S.A.
and that, primarily because of drug use, had neglected S.S.A.

Bryant
said that her investigation revealed that Kim had two other children, that she
had been investigated before in Iowa regarding the two children, and that
although she did not believe that the two children were in Kim’s “care and
custody,” she found no evidence that they had been removed by that state’s
child protective services.  Bryant said that her investigation only revealed
the name of Frank but no other information.  She was unable to locate Frank. 
Bryant also explained S.S.A.’s current living status.  At the time of trial, S.S.A.
lived with her maternal grandfather.  CPS believed that S.S.A. should remain
there.

Former
CPS conservatorship caseworker Kayla Gulling also testified at trial.  Gulling
was responsible for developing temporary orders pending this case.  Gulling
said that because Kim had missed numerous court appearances and visitations
with S.S.A., Gulling had only met Kim once, at a hearing, to which Kim was
transported from the Denton jail that she might attend.[8]
 It was at this hearing that Kim gave further information to Gulling which
aided CPS in locating Frank.  After locating Frank, Gulling took Kim, who
remained in a Denton jail, a picture of Frank, and Kim confirmed that the
picture was S.S.A.’s biological father, Frank.  After this, Gulling sent Frank
a letter explaining that CPS had an open case regarding S.S.A. and that he was her
alleged biological father.

Frank
responded with a letter stating that he did not know of the existence of S.S.A.,
that he questioned whether he was S.S.A.’s father, and that he would like DNA
testing to confirm his potential paternity.  Gulling also stated that because Frank
was frequently incarcerated, he had never had any contact with S.S.A., and that
his incarceration limited his ability to be a parent to S.S.A.  Based on this
evidence, CPS also made the decision to seek termination of his parental
rights.

S.S.A.’s
aunt, whom she had been placed with temporarily earlier in the pendency of this
case, also testified at trial.  Aunt testified that she had known S.S.A. her
entire life and that she first knew of Kim’s pregnancy with S.S.A. when Kim
traveled to Mississippi from Iowa with a man the family believed to be S.S.A.’s
father.  She testified that Kim had told her Frank’s first name.  Aunt said
that although she had heard that Kim told Frank of her pregnancy with S.S.A.,
that information was secondhand.

Aunt
said that since S.S.A.’s birth, both she and S.S.A.’s maternal grandfather
frequently visited S.S.A.  Aunt testified that S.S.A. had been placed with her
when Kim was investigated under a 2007 CPS referral.  Aunt said that she was
aware of Kim’s drug use after the first CPS investigation regarding S.S.A. 
According to Aunt, S.S.A. lived with either the maternal grandfather’s friend, herself,
or S.S.A.’s maternal grandfather during the initial CPS investigation.  Aunt
testified that after CPS returned S.S.A. to Kim the first time, Kim lost
weight, began to be paranoid, and “was broken out . . . her
face had scabs and scars.”  By Aunt’s account, Kim’s physical condition had
deteriorated to such a degree that “[Aunt] had a hard time recognizing her.” 
Aunt also testified that S.S.A.’s health deteriorated at the same time.  Aunt
recalled that when she would pick up S.S.A. for visits, S.S.A. would become
hysterical when she realized they were returning home to Kim’s.

Aunt
testified that she believed S.S.A.’s maternal grandfather’s house was the
proper permanent place for S.S.A.  Aunt said that the maternal grandfather
provided a stable home with a stable relationship—he has been married to Aunt’s
sister for more than twenty-five years.  Aunt testified that she believed it in
S.S.A.’s best interest that Kim’s parental rights be terminated due in large
part to Kim’s “constantly [bringing different] men in and out of her life, . . . so
many I could probably, you know, list them off on two hands.”

S.S.A.’s
maternal grandfather also testified at trial.  He said that Kim had been in
foster homes most of her life, but that at one point she was placed in an Iowa
“halfway house when she was around [seventeen].”  The grandfather said that Kim
escaped from that facility with a person whom he understood was S.S.A.’s biological
father.  After a few moves and a displacement from Mississippi caused by
Hurricane Katrina, Kim lived with grandfather for a short time.  S.S.A. was born
shortly thereafter.  When S.S.A. was between nine and fifteen months old,
grandfather recalled Kim having multiple conversations with Frank on the
phone.  One such call revolved around Kim asking Frank for financial support of
S.S.A. and for him to “step up and take responsibility.”  He said that she
specifically told Frank he was S.S.A.’s father.  Grandfather said he had no
doubt that Frank was aware that he was S.S.A.’s biological father and that
these phone calls occurred prior to Frank’s current incarceration.

Grandfather
said that Kim previously had two children removed from her custody in Iowa.  He
also testified that S.S.A. had stayed with him during both CPS investigations. 
In fact, grandfather testified that he spent as much time with S.S.A. as he
could since she was born: “We used to try to pick her up on the weekends and
take her out to our house whenever we could.”

Grandfather
said that when S.S.A. first began living with him this most recent time, she
suffered from numerous health issues, including upper respiratory infections. 
He opined that these infections were caused in part from the constant moving
and living in motels: “[T]hey lived in motels most of the time, so they smoked
a lot, never opened the doors, so she was constantly at the ER.”  Grandfather
said that since she had lived with him, S.S.A.’s health had improved
dramatically, and he was able to pay for an MRI himself prior to a recent eye
surgery that S.S.A. had needed since she was born and had been suggested at two
years old.  Grandfather said that he and his wife, who also have a fourteen-year-old
daughter, were ready and willing to adopt S.S.A. and provide her with a stable home.

Lori
Powell, a CASA representative, also testified.  According to Powell, S.S.A. was
nearly five and one-half years old at the time of trial.  Powell testified that
CPS’s home study of the maternal grandfather’s placement revealed a “very
positive” placement.  Powell said that the grandfather “clearly [has] the
ability to provide a safe and stable environment” for S.S.A.  Powell also said
that CASA recommended that the trial court appoint grandfather permanent
managing conservator of S.S.A., and that the grandfather wished to adopt S.S.A.

Powell
testified that permanency was “[a]bsolutely, critical” in a child’s life.  She
recommended terminating Kim’s parental rights because S.S.A. had lacked
important elements in her life like “physical support, financial support, and
her emotional needs.”  Powell also said that CASA recommended terminating
Frank’s rights because ”[Frank] hasn’t had a relationship with [S.S.A.], and
that he is incarcerated and could be as far into as 2012.”  She also said that
Frank had never provided any kind of support for S.S.A.—physical, financial, or
emotional.  Powell said that based on the testimony at trial, she believed that
Frank was aware of Kim’s pregnancy with S.S.A.  And Powell also said that Frank
demonstrated a lack of interest in S.S.A.’s well-being by not attempting to
correspond with CPS about S.S.A.’s placement or how she was being provided for,
even after confirming his paternity through testing.  But Powell also testified
that Frank’s request in his initial letter to the trial court for information
regarding the status of charges against S.S.A.’s alleged assailant in this
latest referral and for S.S.A.’s medical records did show “some concern” regarding
S.S.A.’s well-being.

Rachel
Phillips, a CPS conservatorship worker, testified that she also had worked
S.S.A.’s current referral, which led to CPS’s pursing termination of Kim’s and
Frank’s paternal rights and placement of S.S.A. with the maternal grandfather. 
Phillips said that frequent visits to the maternal grandfather’s house since S.S.A.’s
placement there have revealed that “[S.S.A.] [is] doing well.  She’s had eye
surgery recently, and it went well.“  Phillips said that the maternal
grandfather wished to adopt S.S.A.

Phillips
testified that she had no doubt that Frank knew of Kim’s pregnancy with S.S.A. 
She also said that Frank knew of the criminal and drug-prevalent environment
that S.S.A. lived in when S.S.A. lived with Kim.  Phillips averred that Frank
had not provided CPS with any family or kinship possibilities, that he was not
a placement option, nor was he able to provide S.S.A. with a safe environment
due to his incarceration, and that she believed Frank had constructively
abandoned S.S.A.  She also testified that Frank had knowingly engaged in the
criminal activity that he knew could lead to incarceration after he had
knowledge of S.S.A.  Phillips said that Frank had demonstrated an inability to
care for S.S.A. and, despite evidence that Kim had sought financial support
from Frank for the care of S.S.A., he had never paid child support.  Ultimately,
Phillips stated that

The department feels
that [Frank] has known that [S.S.A.] was his child.  If not known, maybe that
there was a great possibility that she was and that he engaged in criminal
activities at that time that led to his incarceration and him not being able to
care for her now.  And so the department feels it’s in her best interest to
have permanency, and we feel that she can have that with [her maternal
grandfather].

 

          After
closing arguments, and relative to Frank, the trial court said that it was
specifically finding by clear and convincing evidence that Frank “learned at
some point prior to his current incarceration that he was likely or alleged to
be the father of [S.S.A.].”  The trial court also found that Frank had taken
“no steps to support [S.S.A.], to become a part of [S.S.A.’s] life, to
determine [for sure] whether or not he was, in fact, [S.S.A.’s] father, or do
anything else in relation to [S.S.A.].”  The trial court also stated that
Frank’s correspondence with the court since learning of the termination suit
demonstrated a “relatively shallow concern” for S.S.A.  The trial court found
that Frank had knowingly placed or allowed S.S.A. to remain in conditions that
endangered her physical and emotional well-being; that Frank had engaged in
conduct or knowingly placed S.S.A. with persons who engaged in conduct which
endangered her physical and emotional well-being; and that Frank had knowingly
engaged in criminal conduct that has resulted in his conviction of an offense
and confinement or imprisonment and inability to care for S.S.A. for not less
than two years from the date CPS filed this termination petition.  The trial
court also found termination of Frank’s paternal rights in S.S.A.’s best
interest.  Based on these findings, the trial court terminated Frank’s paternal
rights to S.S.A.  This appeal followed.[9]

III.  Discussion

A.      Frank
Knew of S.S.A. Prior to Paternity Testing

In
part of all of Frank’s six issues,[10] he challenges the legal
and factual sufficiency of the evidence to support the trial court’s finding
that he knew that he was S.S.A.’s biological father.[11] 
The Department responds that the trial court’s finding that Frank knew of
S.S.A. prior to his incarceration is supported legally and factually by the
record.  We agree with the Department.

1.       Burden of Proof

A
parent’s rights to “the companionship, care, custody, and management” of his
children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388,
1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  In a
termination case, the State seeks not just to limit parental rights but to
erase them permanently—to divest the parent and child of all legal rights,
privileges, duties, and powers normally existing between them, except for the
child’s right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (West 2008); Holick
v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick, 685 S.W.2d at 20–21; In re
M.C.T., 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination
is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (West
Supp. 2011); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both
elements must be established; termination may not be based solely on the best
interest of the child as determined by the factfinder.  Tex. Dep’t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).

Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. §§ 161.001, 206(a) (West 2008).  Evidence is clear and convincing if
it “will produce in the mind of the trier of fact a firm belief or conviction
as to the truth of the allegations sought to be established.”  Id. § 101.007
(West 2008).  Due process demands this heightened standard because termination
results in permanent, irrevocable changes for the parent and child.  In re
J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In re J.A.J., 243
S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and
modification).

B.      Legal
Sufficiency Standard of Review

In
reviewing the evidence for legal sufficiency in parental termination cases, we
must determine whether the evidence is such that a factfinder could reasonably
form a firm belief or conviction that the grounds for termination were proven. 
In re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We must review all
the evidence in the light most favorable to the finding and judgment.  Id. 
This means that we must assume that the factfinder resolved any disputed facts
in favor of its finding if a reasonable factfinder could have done so.  Id. 
We must also disregard all evidence that a reasonable factfinder could have
disbelieved.  Id.  We must consider, however, undisputed evidence even
if it is contrary to the finding.  Id.  That is, we must consider
evidence favorable to termination if a reasonable factfinder could and
disregard contrary evidence unless a reasonable factfinder could not.  Id.

We
must therefore consider all of the evidence, not just that which favors the
verdict.  Id.  But we cannot weigh witness credibility issues that
depend on the appearance and demeanor of the witnesses, for that is the
factfinder’s province.  Id. at 573, 574.  And even when credibility
issues appear in the appellate record, we must defer to the factfinder’s
determinations as long as they are not unreasonable.  Id. at 573.

C.      Factual
Sufficiency Standard of Review

In
reviewing the evidence for factual sufficiency, we must give due deference to
the factfinder’s findings and not supplant the judgment with our own.  In re
H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We must determine whether, on the
entire record, a factfinder could reasonably form a firm conviction or belief
that the parent violated the applicable subsection to 161.001 and that the
termination of the parent-child relationship is in the best interest of the
child.  Tex. Fam. Code Ann. § 161.001; In re C.H., 89 S.W.3d
17, 28 (Tex. 2002).  If, in light of the entire record, the disputed evidence
that a reasonable factfinder could not have credited in favor of the finding is
so significant that a factfinder could not reasonably have formed a firm belief
or conviction in the truth of its finding, then the evidence is factually
insufficient.  H.R.M., 209 S.W.3d at 108.

D.      Frank’s
Knowledge of His Paternity

Viewing
the entire record in light most favorable to the trial court’s judgment, the
record reveals that Frank was aware of S.S.A. prior to her being fifteen months
old.  S.S.A.’s grandfather testified that Kim discussed S.S.A. with Frank on
multiple occasions when S.S.A. lived with the grandfather between the ages of
nine months and fifteen months old.  Furthermore, multiple Department representatives
and one CASA representative all testified that Frank knew of his paternity to S.S.A.
prior to his current incarceration.  There was also testimony that Frank had
someone inquire about S.S.A., prior to her being a year old.

Frank’s
response is that the record does not demonstrate his affirmative knowledge of
paternity until after the paternity test confirmed he was S.S.A.’s biological
father less than seven months prior to the termination trial.  This court also
notes that there was testimony that at one time Kim may have believed a man
other than Frank was S.S.A.’s father.  After carefully reviewing the entire
record and viewing all of the evidence in the light most favorable to the
finding and judgment, we hold that the evidence is such that a factfinder could
reasonably form a firm belief or conviction that Frank knew of his paternity to
S.S.A. before she was fifteen months old; thus, Frank knew of S.S.A. prior to
the conduct that led to his incarceration in 2009.  See Tex. Fam. Code
Ann. § 161.001(1)(Q).  Accordingly, we hold that the evidence is legally
and factually sufficient to support the trial court’s finding regarding Frank’s
knowledge of his paternity.

E.      The
Trial Court’s Section 160.001(1)(Q) Finding

In
part of his fourth issue, Frank contends that the evidence is legally and
factually insufficient to support the trial court’s finding that he knowingly
engaged in criminal conduct that resulted in his conviction for an offense and
confinement resulting in his inability to care for S.S.A. for not less than two
years from the date of the filing of the petition.  Specifically, Frank argues
that there is no evidence in the record of “the length of [Frank’s]
incarceration and its end date.”  We disagree.

Subsection
161.001(1)(Q) warrants termination of parental rights when a parent knowingly
engaged in criminal conduct, resulting in the parent’s conviction of an
offense, and the parent is both incarcerated and unable to care for the child
for at least two years from the date the termination petition was filed.  Tex.
Fam. Code Ann. § 161.001(1)(Q).  This court and other Texas appellate courts
have construed section 161.001(1)(Q) as requiring a three-step process.  See
In re E.S.S., 131 S.W.3d 632, 639 (Tex. App.—Fort Worth 2004, no
pet.); see also In re Caballero, 53 S.W.3d 391, 395 (Tex. App.—Amarillo
2001, pet. denied).  First, the party seeking termination must establish that
the parent’s knowing criminal conduct resulted in incarceration for more than
two years.  E.S.S., 131 S.W.3d at 639–40.  Second, the parent must
produce some evidence as to how he would provide or arrange to provide care for
the child during that period.  Id.  Finally, the party seeking
termination would then have the burden of persuasion that the arrangement would
not satisfy the parent’s duty to the child.  Id.

In
part of this issue, Frank contends that the trial court abused its discretion
by admitting certain evidence, over his hearsay objections, depicting the date
Frank was incarcerated and his expected release date.  Frank contends that
without these admitted documents—exhibits 4, 9, and 10—the evidence is
insufficient to prove a release date satisfying section 160.001(1)(Q)’s
requirement that he has the inability to care for S.S.A. for not less than two
years from the date of the filing of the petition to terminate his parental
rights.  Tex. Fam. Code Ann. § 161.001(1)(Q).

Assuming
without deciding that the trial court should not have admitted the challenged
evidence, we cannot conclude on this record that Frank was harmed by their admission. 
See Tex. R. App. P. 44.1(a)(1) (stating that reversal occurs only when
an error “probably caused the rendition of an improper judgment.”).  As the
Department points out, the trial court took judicial notice of the court’s
file.  In the court’s file, there exist multiple documents reflecting Frank’s expected
release date from his current incarceration in February 2012.  There is also ample
evidence in the record supporting the trial court’s finding that Frank knew of his
paternity to S.S.A. prior to his current conviction that led to his
incarceration and that it is expected he would remain there for two years from
the filing of the petition seeking termination.  Indeed, the evidence
demonstrates that CPS sought termination in November 2009 and that Frank was
scheduled to remain incarcerated until February 2012.  We hold that, even
assuming the complained-of evidence should not have been admitted, the record
contains sufficient evidence to support the trial court’s findings as to the
first element of a 161.001(1)(Q) finding; namely, that Frank knowingly committed
criminal conduct resulting in his incarceration for more than two years from
the petition’s filing.  See E.S.S., 131 S.W.3d at 639–40.

Furthermore,
Frank bore the burden of demonstrating how he would provide or arrange to
provide care for S.S.A. during his incarceration.  Id.  The record, however,
demonstrates that Frank never provided CPS with any family or kinship
possibilities for S.S.A.’s placement during his incarceration.  Frank also did
not supply the trial court with any testimony, through affidavit or other
means, of how he intended to provide this support.  Thus, Frank failed to carry
his burden demonstrating that he could provide for S.S.A. during his
incarceration.  See id.  Finally, because Frank failed to carry his
burden, the Department was relieved of carrying its burden of persuasion that
Frank’s offered care provisions were satisfactory.  See Caballero, 53
S.W.3d at 396 (holding that petitioner carries no burden of persuasion under
161.001(1)(Q)’s care element when parent fails to provide some evidence of provisional
care for child during incarceration).  We overrule Frank’s fourth issue.

          F.       Best
Interest of S.S.A.

          In
his fifth issue, Frank contends that the evidence is legally and factually insufficient
to support the trial court’s ruling that termination of the parent-child
relationship between Frank and S.S.A. is in S.S.A.’s best interest.

          There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt
and permanent placement of the child in a safe environment is also presumed to
be in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).  The following factors should be considered in evaluating the parent’s
willingness and ability to provide the child with a safe environment:

(1)     the child’s age
and physical and mental vulnerabilities;

 

(2)     the frequency
and nature of out-of-home placements;

 

(3)     the
magnitude, frequency, and circumstances of the harm to the child;

 

(4)     whether the
child has been the victim of repeated harm after the initial report and
intervention by the department or other agency;

 

(5)     whether the
child is fearful of living in or returning to the child's home;

 

(6)     the results
of psychiatric, psychological, or developmental evaluations of the child, the
child’s parents, other family members, or others who have access to the child's
home;

 

(7)     whether there
is a history of abusive or assaultive conduct by the child’s family or others
who have access to the child's home;

 

(8)     whether there
is a history of substance abuse by the child’s family or others who have access
to the child’s home;

 

(9)     whether the
perpetrator of the harm to the child is identified;

 

(10)    the
willingness and ability of the child’s family to seek out, accept, and complete
counseling services and to cooperate with and facilitate an appropriate agency’s
close supervision;

 

(11)    the willingness
and ability of the child’s family to effect positive environmental and personal
changes within a reasonable period of time;

 

(12)    whether the
child’s family demonstrates adequate parenting skills, including providing the
child and other children under the family’s care with:

 

(A)     minimally
adequate health and nutritional care;

 

(B)     care,
nurturance, and appropriate discipline consistent with the child's physical and
psychological development;

 

(C)     guidance and
supervision consistent with the child’s safety;

 

(D)     a safe
physical home environment;

 

(E)     protection
from repeated exposure to violence even though the violence may not be directed
at the child; and

 

(F)     an
understanding of the child’s needs and capabilities; and

 

(13)    whether an
adequate social support system consisting of an extended family and friends is
available to the child.

Id. § 263.307(b);
R.R., 209 S.W.3d at 116.

Other,
nonexclusive factors that the factfinder in a termination case may use in
determining the best interest of the child include:  (A) the
desires of the child; (B) the emotional and physical needs of the child
now and in the future; (C) the emotional and physical danger to the child
now and in the future; (D) the parental abilities of the individuals
seeking custody; (E) the programs available to assist these individuals to
promote the best interest of the child; (F) the plans for the child by
these individuals or by the agency seeking custody; (G) the stability of
the home or proposed placement; (H) the acts or omissions of the parent
which may indicate that the existing parent-child relationship is not a proper
one; and (I) any excuse for the acts or omissions of the parent.  Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976).

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each factor will not support such a finding.  Id.

          Here,
regarding S.S.A.’s age and physical and mental vulnerabilities, the record
demonstrates that S.S.A. was nearly five and one-half years old at the time of
trial.  The record demonstrates that prior to her current placement with her
maternal grandfather, S.S.A.’s health had deteriorated and she was frequently
in the emergency room due to poor care and exposure to frequent moves and smoke
inhalation.  The record demonstrates that at best, Frank simply did not take
any action to aid S.S.A. regarding her physical or mental vulnerabilities, or at
worse, his complicity allowed S.S.A. to live in an environment of drug abuse
and crime.

The
record also demonstrates that prior to placement, S.S.A. was delayed in
receiving care for a congenital eye condition.  Since moving in with her
grandfather, S.S.A. has received the surgery she needed, and her health has
improved dramatically.

          Pertaining
to the frequency and nature of out-of-home placements, S.S.A. has already lived
portions of her young life with a family friend, her grandmother, her aunt on
two occasions, her maternal grandfather on two occasions, and her mother, who
frequently moved and lived with a revolving door of boyfriends.  Frank has
never been a part of S.S.A.’s life, and despite his knowledge of her existence,
never afforded any effort to assist her living conditions or otherwise provide
a stable and safe environment for her to grow up in.  In contrast, S.S.A.’s
maternal grandfather, who wishes to adopt S.S.A., has been one of the most
stable people in her life.  In addition to living with him during multiple CPS referrals
regarding Kim, the grandfather has also committed himself to visiting S.S.A. as
frequently as possible since her birth.  Reports indicated positive reviews of
her placement in her grandfather’s home.  The maternal grandfather also wishes
to adopt S.S.A., giving her a permanency in living conditions that she has
lacked her entire life.

          The
record is simply void of any evidence regarding the willingness and ability of Frank
to seek out, accept, and complete counseling services in conjunction with CPS
pertaining to S.S.A.  Even assuming he was unaware of S.S.A. until the
paternity test, the trial court specifically found that his actions since the
paternity test have demonstrated a “relatively shallow concern” for S.S.A.  On
the flip side, S.S.A.’s maternal grandfather has shown a willingness to
cooperate with CPS, including having a home study performed, and he has allowed
the agency’s close supervision of his relationship with S.S.A.

          The
record further demonstrates that Frank has never provided any type of care for
S.S.A, including not providing health or nutritional care, or any other type of
care geared at providing S.S.A. with the proper physical and psychological
development she needs.  In contrast, the maternal grandfather has provided
food, shelter, financial support for an MRI, surgery and other health care
needs, and, perhaps most important, the grandfather has provided S.S.A. with a
safe physical home environment that includes a social support system consisting
of his wife, his fourteen-year-old daughter, and his sister-in-law, S.S.A.’s
aunt, who is also heavily involved in S.S.A.’s life.  Frank, on the other hand,
through his acts of crime and omission of care in S.S.A.’s life, has indicated
that the existing parent-child relationship between himself and S.S.A. is not a
proper one.  Indeed, the record indicates that Frank has spent the majority of
his life in and out of prison, and other than an indication in the record that
he intends to attend drug counseling during his current incarceration, Frank
did not explain to the trial court any willingness to take steps necessary to
become a better father to S.S.A.

          In
summary, viewing the evidence in the light most favorable to the trial court’s
best interest finding, we conclude and hold that the evidence produced at trial
was sufficient to produce in the mind of the trial court a firm belief or
conviction as to the truth of the allegation that termination of Frank’s
paternal rights to S.S.A. was in her best interest.  We overrule Frank’s fifth
issue.  Having overruled portions of Frank’s six issues, and having overruled
his fourth and fifth issues in their entirety, we need not address the remaining
portions of Frank’s issues pertaining to the trial court’s other findings under
161.001.  See In re M.N.G., 147 S.W.3d 521, 540 n.9 (Tex. App.—Fort
Worth 2004, pet. denied) (op. on reh’g).

IV.  Conclusion

          Having
overruled Frank’s fourth, fifth, and portions of all six of his issues which
are dispositive, we affirm the trial court’s order terminating his parental
rights to S.S.A. 

 

 

BILL MEIER

JUSTICE

 

PANEL:  DAUPHINOT, MEIER, and GABRIEL, JJ.

 

DAUPHINOT, J., concurs without opinion.

 

DELIVERED: 
July 19, 2012









[1]See Tex. R. App. P. 47.4.





[2]Because this case involves
the termination of parental rights to a minor, we use aliases or initials to
describe the parties.  See Tex. R. App. P. 9.8.





[3]See Tex. Fam. Code
Ann. § 161.001(1) (West Supp. 2011).





[4]See Tex. Fam. Code
Ann. § 161.001(2) (West Supp. 2011).





[5]The record is replete with
evidence that Kim would move frequently, usually coinciding with her having a
new boyfriend.





[6]There is evidence in the
record that hearings other than those mentioned in this opinion were also held
in conjunction with this termination suit.





[7]There is no evidence that
Frank requested to participate in the trial through other means such as
affidavit or telephonic participation.  See In re D.D.J., 136
S.W.3d 305, 313–14 (Tex. App.—Fort Worth 2004, no pet.) (reasoning that an
inmate who is not allowed to participate in a family matter lawsuit due to
incarceration should be allowed to “proceed by affidavit, deposition,
telephone, or other effective means”).





[8]This appears to be a
permanency hearing where no reporter’s record was transcribed.





[9]The trial court also
ordered that Kim’s paternal rights to S.S.A. be terminated.  Kim did not file
an appeal.





[10]Frank’s issues on appeal
track the issues raised in his motion for new trial and in his statement of
points, both filed fourteen days after the trial court entered its order to
terminate Frank’s parental rights.  See Tex. Fam. Code Ann. § 263.405(b)
(West Supp. 2011), amended by Act of May 19, 2011, 82d Leg., R.S.,
ch. 75, § 4, 2011 Tex. Gen. Laws 348, 349–50 (no longer requiring a
party seeking appellate review to have filed a statement of points with trial
court).





[11]In part of his briefing,
Frank asserts that “[t]he testimony from all witnesses indicates that [Frank]
was unaware of his being the father of S.S.A. until the results of the
paternity test were made known.”  This is simply false.  The trial court
specifically found that Frank was aware of his paternity to S.S.A. prior to his
most recent incarceration and prior to the court-ordered paternity testing. 
Moreover, multiple witnesses testified to Frank’s knowledge of his paternity
and that Frank knew of S.S.A. prior to his most recent incarceration.